UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLY ROMERO, as Personal
Representative for the Estate of
Stephen Romero,

      Plaintiff,

v.

CITY OF LANSING, et al.,

      Defendants.

_____/

Case No. 1:23-cv-1322

Hon. Hala Y. Jarbou

## OPINION

This is a civil rights action under 42 U.S.C. § 1983 against the City of Lansing (the "City"), and Lansing Police Officers Donovan Moore and Jeff Kurtz.  Plaintiff Ashly Romero claims that Defendants violated the constitutional rights of her husband, Stephen Romero.[1]  Before the Court is Defendants' motion to dismiss the complaint (ECF No. 20).  For the reasons herein, the Court will grant the motion.

## I. BACKGROUND

### A. Summary

When responding to a 911 call from Plaintiff reporting domestic violence by Romero and subsequent calls from others reporting a shooting, Officers Moore and Kurtz confronted Romero at gunpoint in Plaintiff's driveway.  Romero was standing near Plaintiff as she was seated in a vehicle.  Moore and Kurtz commanded Romero to show his hands and to get on the ground. Romero first put two cell phones that he was holding onto the ground.  He then got on his knees

---

[1] For simplicity's sake, the Court will refer to Ashly Romero as "Plaintiff" and to Stephen Romero as "Romero."

and lifted his shirt to show the officers a pistol at his waist.  When Romero reached down and put his hand on the gun, Moore shot him.  Seconds later, Romero grabbed his weapon again.  Moore and Kurtz fired on him again.  Romero died from his injuries.  Plaintiff brings this action on behalf of Romero's estate.

### B. Allegations

The following facts are taken from the amended complaint (ECF No. 13) and from videos of the incident taken by body cameras worn by Moore and Kurtz.  The Court can consider the video recordings for reasons discussed below.  The Court construes the facts and draws all reasonable inferences in favor of Plaintiff.

On the evening of December 1, 2023, Plaintiff called the Ingham County central dispatch to report a "domestic disturbance" in the driveway of Plaintiff and Romero's residence.[2]  (Am. Compl. ¶ 16.)  Plaintiff told the dispatcher that Romero owned a gun but that the gun was inside an automobile with Plaintiff.  (*Id.* ¶ 18.)  At 11:19 pm, the dispatcher reported to officers that Plaintiff had not been threatened with a weapon, that she was inside a white Chevy parked in her driveway, and that the firearm was secured inside her car.  (*Id.* ¶¶ 21-22.)

Officers Moore and Kurtz responded to the domestic disturbance report.  Their bodycam videos show that, at 11:24 pm, while Defendants were on the way to the scene, the dispatcher reported over the radio that there had been a gunshot.  At 11:25 pm, another caller allegedly told the dispatcher that she believed a shooting had occurred, though she did not observe it herself.  (Am. Compl. ¶ 24.)  The dispatcher reported some of that information to Moore and Kurtz, saying,

---

[2] Plaintiff contends that she made the call because Romero had slapped her.  (Pl.'s Resp. Br. 17, ECF No. 24.)

2

"It sounds like a female has been shot.  This is going to be a confirmed shooting."  (Kurtz Video 23:25:43, ECF No. 9-1.)[3]

Moore and Kurtz arrived in separate vehicles near Plaintiff's house at about 11:26 pm, moments apart from one another.  They saw Romero standing beside a white Chevy vehicle.  (Am. Compl. ¶ 27.)  Moore asked the dispatcher whether "that white car is supposed to be in the driveway"; the dispatcher responded, "As far as we know, she was out front."  (Moore Video 23:26:32, ECF No. 9-2.)  Around that time, a third caller believed to be Romero's daughter told the dispatcher that her mother had *not* been shot.  (Am. Compl. ¶ 25.)  The dispatcher reported this information to Moore and Kurtz either "over the air or via computer."  (*Id.* ¶ 26.)[4]

Moore and Kurtz exited their vehicles with guns drawn and ran toward Romero, who was standing by the open driver's side door of the Chevy, apparently arguing with Plaintiff, who was seated inside the vehicle.[5]  As Moore approached, he told Romero, "Hey! Show me your hands! Show me your hands!"  (Moore Video 23:26:54.)  Plaintiff briefly shouted or screamed.  (*Id.* 23:26:55.)  Romero turned and faced Moore with his hands visible.  He was holding two cell phones, one in each hand.  Moore, who was now about ten feet away from Romero, shouted, "Show me your hands! Get on the ground! Get on the ground now! Get on the ground, I'll shoot you!"  Romero responded, "Bro, bro," and slowly placed the cell phones on the ground.  (*Id.*

---

[3] Time references in the videos refer to the "AXON" timestamps in the upper right corner of the videos.  These timestamps ostensibly correspond to the times at which the events occurred.  Thus, for instance, "23:25:43" refers to 11:25:43 pm.

[4] Defendants dispute this allegation and reject it as implausible, but the Court must accept it as true.  The video recordings do not blatantly contradict it.  Although there is no audible evidence that the dispatcher reported this information over the radio, and although there was only a short window of time between the alleged call to the dispatcher and the moment the officers left their vehicles, it is plausible that they saw the dispatcher's report on the computer screens in their cruisers.  On the other hand, Plaintiff's assertion that Defendants "were aware that *no one* had been shot" (Am. Compl. ¶ 26 (emphasis added)) is conclusory and unsupported.

[5] The sound of yelling by a male and a female is audible in the video recording.

23:27:02.)  By this time, Kurtz had positioned himself next to Moore and was pointing his own firearm at Romero.

Moore repeatedly told Romero to "Get on the ground!" while Kurtz said, "Face down!" (*Id.* 23:27:06.)  Romero got on his knees and kept his hands in the air.  Romero then reached to his waist and pulled up his shirt, revealing a pistol in his waistband.  Plaintiff yelled "Stop!"  (*Id.* 23:27:08.)  Moore and Kurtz continued telling Romero to get on the ground and to put his face down.  Instead, he reached down and put his hand on the handle of his pistol.  (*Id.* 23:27:09.)  At this point, Moore fired four rounds at Romero, wounding him and causing him to fall forward onto his elbows.  (*Id.* 23:27:11.)

Almost immediately after landing on his elbows, and while saying "I got you, I got you!," Romero grabbed his pistol again and pulled it out of his waistband, apparently in order to throw it toward the officers.  (*Id.* 23:27:12.)  But when his hand grasped his gun, Moore and Kurtz fired about ten more rounds at him.  (*Id.* 23:27:13.)  The entire incident from the moment Moore first spoke to Romero to the moment Moore and Kurtz shot him a second time lasted about 20 seconds.

When Kurtz questioned Plaintiff about a minute later and asked whether she was injured, she told him that Romero had "slapped" her and "shot outside," but "he didn't shoot anybody." (Kurtz Video 23:28:20-27.)

**C. Claims**

Based on the foregoing facts, Plaintiff claims in Count I of her amended complaint that Moore and Kurtz used excessive force on Romero, in violation of the Fourth Amendment.  In Count II, she claims that Moore and Kurtz are liable for failing to prevent the other from using excessive force.  In Count III, she claims that the City is liable for failing to adequately train and supervise its officers in the use of deadly force.

Defendants move to dismiss the complaint for failure to state a claim.

4

## II. LEGAL STANDARDS

### A. Motion to Dismiss

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id*. (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Qualified Immunity

Defendants Moore and Kurtz argue they are entitled to qualified immunity.  An officer is entitled to qualified immunity and is shielded from damages and the burdens of suit "if his conduct does not violate a clearly established statutory or constitutional right of which a reasonable official would have known." *Smith v. City of Troy*, 874 F.3d 938, 943 (6th Cir. 2017) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Determining an officer's entitlement to qualified immunity thus "involves a two-step inquiry." *Smith*, 874 F.3d at 944.  First, the Court must determine

whether the facts alleged, judged in a light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right.  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "If no constitutional right would have been violated on the facts alleged, the inquiry stops at that point and the officer is entitled to qualified immunity."  *Id.*

Second, "[i]f a violation can be made out . . . the court must determine whether the right at stake was clearly established."  *Id.*  "In making this determination, the court must rely on decisions from the United States Supreme Court, the Sixth Circuit Court of Appeals, or finally, the decision of other circuit courts."  *Id.* (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993)).  "Although 'a case directly on point' is not necessary to overcome qualified immunity, 'existing precedent must have placed the . . . constitutional question beyond debate.'"  *Linden v. City of Southfield*, 75 F.4th 597, 602 (6th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "If either prong [of the test for qualified immunity] is not met, then the government officer is entitled to qualified immunity."  *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018). The Court can consider the two prongs in any order.  *Gambrel v. Knox Cnty.*, 25 F.4th 391, 401 (6th Cir. 2022).

Once the defense of qualified immunity is raised, the "plaintiff bears the burden of overcoming qualified immunity."  *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).  That burden includes "pointing to legal authority that clearly shows that the constitutional question . . . should be resolved in [the plaintiff's] favor."  *Linden*, 75 F.4th at 604.

### III. ANALYSIS

#### A. Evidence

At the outset, the Court must determine what evidence it will consider.  In support of their motion, Defendants rely upon body camera videos of the incident.  When considering a motion to dismiss under Rule 12(b)(6), the Court's decision "rests primarily upon the allegations of the

complaint[.]" *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008).  However, the Court can also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion . . .  so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

The Court can also consider video evidence where the complaint relies on facts that "could only be known . . . by watching the video[.]" *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022).  In such cases, "it makes little sense to waste time and effort by ignoring the video['s] contents." *Id*.  However, that use is limited; "[i]f there is a factual dispute between parties, [the Court] can only rely on the video[] over the complaint to the degree the video[] [is] clear and 'blatantly contradict[s]' or 'utterly discredit[s]' the plaintiff's version of events." *Id*.  (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court's summary of the facts and evidence in Section I above conforms with these rules.  The Court can consider the videos because they depict conduct and events that could only be known by watching them.  Indeed, the amended complaint refers to events occurring at specific moments in time, down to the second they occurred (Am. Compl. ¶¶ 28, 43); those times could only be known by watching the videos.  Accordingly, it makes little sense to ignore the contents of the videos at this stage.  Regardless, the Court accepts the well-pleaded allegations of the complaint as true unless the videos blatantly contradict them.

### B. Count I: Fourth Amendment – Excessive Force (Moore & Kurtz)

The Fourth Amendment protects against unreasonable searches and seizures.  "A seizure is 'unreasonable' under the Fourth Amendment if officers used excessive force." *Puskas v. Del. Cnty.*, 56 F.4th 1088, 1093 (6th Cir. 2023) (quoting *Gambrel*, 25 F.4th at 400).  In determining whether an officer's use of force was excessive, the Court "balances the government's interest in preventing crime and protecting the public and the officers against a suspect's interest in avoiding

7

injury." *Gambrel*, 25 F.4th at 400.  The Court considers whether the "officer['s] actions are objectively reasonable in light of the facts and circumstances confronting [him] without regards to [his] underlying intent or motivations." *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted)).

The Court must evaluate each incident in its own context, considering factors such as "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 687 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396).  This test evaluates the "reasonableness of the moment of the use of force as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Kent*, 810 F.3d at 390 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 320 (6th Cir. 2015) (internal quotation marks omitted)).  The Court must account for the fact that "police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  When "a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith*, 874 F.3d at 944).  "The ultimate question, however, is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Kent*, 810 F.3d at 390 (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

The Court will segment the incident into the following three uses of force: (1) pointing firearms at Romero; (2) shooting Romero when he initially grabbed his pistol; and (3) shooting Romero again after he grabbed his pistol a second time.

### 1. Pointing Firearms at Romero

As a general matter, "a police officer may approach a suspect with a weapon drawn during a . . . stop when the officer reasonably fears for his safety." *Wright*, 962 F.3d at 865.  But "[a]n officer's decision to point a gun at an unarmed civilian who objectively poses no threat to the officer or the public can certainly sustain a claim of excessive force." *Id.* at 866 (quoting *Croom v. Balkwill*, 645 F.3d 1240, 1252 n.17 (11th Cir. 2011) (collecting cases)).  Here, Defendants reasonably feared for their own safety or the safety of others.  Construing the allegations and evidence in the light most favorable to Plaintiff, they were confronting a domestic dispute involving the discharge of a firearm.  While the officers were driving to the scene, the dispatcher reported a "gunshot" and then a "confirmed shooting" where it appeared a female had been shot. Even if Defendants learned seconds before leaving their cruisers that Plaintiff herself had not been shot, they had reason to believe that a firearm had been used and that Plaintiff had been a target or perhaps another woman nearby had been a victim.  Those facts alone gave Defendants reason to approach Romero with a show of deadly force in order to dissuade him or anyone else from using a firearm again.  Furthermore, officers in such a situation would not necessarily know which information they were receiving within such a short span of time was the most accurate; thus, a report that Plaintiff had *not* been shot would not necessarily eliminate that possibility in their minds or remove all concerns about her safety.  And such safety concerns would have been amplified by the circumstances they witnessed upon arrival: two individuals (whom the officers would have reasonably assumed were Plaintiff and the shooter) arguing or yelling at one another.  In other words, the domestic dispute had not ended.  And Plaintiff herself was not fully visible, so it would not have been clear whether she was unharmed.

When attempting to overcome qualified immunity, Plaintiff cites no case that "come[s] close to resembling the facts" at issue here, i.e., officers responding to an ongoing domestic dispute

that involved the discharge of a firearm.  *See Gambrel*, 25 F.4th at 401.  In *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005), an officer was not entitled to qualified immunity for firing a shotgun at two individuals wrestling over a gun without providing any warning to them beforehand.  *Id.* at 962.  That case is not applicable to the question here because it did not assess whether pointing a gun at the victims was an excessive use of force.

In *Reed v. Campbell County*, 80 F.4th 734 (6th Cir. 2023), police officers responding to a report of a domestic dispute taking place outside a home found no evidence of an altercation, so they knocked on the door to the home.  *Id.* at 740.  After the plaintiff answered the door, he spoke to the officers briefly and then tried to shut the door.  One officer responded by forcing the door open and pointing a gun at the plaintiff's head.  *Id.* at 741.  The court concluded this officer was not entitled to qualified immunity for his conduct because there was no basis to think the plaintiff "committed a serious crime or posed a threat to [the plaintiff's] or others' safety."  *Id.* at 749.

In contrast, Officers Moore and Kurtz were responding to more than a simple domestic dispute because it involved the use of a dangerous weapon.  And when they arrived at the scene, they could observe signs that the dispute was still in progress.  As Plaintiff acknowledges, they "heard yelling consistent with a domestic dispute."  (Pl.'s Resp. Br. 19, ECF No. 24.)  Thus, they had reason to believe that their own safety or the safety of others might be at risk by further use of the firearm.

Plaintiff notes that Defendants did not observe a visible weapon.  Regardless, they were aware that one had been used; they could not have known where it was located when they arrived. They could have reasonably suspected that Romero was still carrying one on his person, as turned out to be the case.  Thus, Plaintiff's cases are readily distinguishable.  She has not met her burden

of overcoming qualified immunity regarding Defendants' decision to point firearms at Romero at the start of their encounter with him.

### 2. Shooting Romero

It is clearly established that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006). Officers need not wait until a suspect raises his weapon and points it at officers before using deadly force. *See Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018). The surrounding circumstances can elevate the threat, such as the suspect's manner of holding the weapon, a short distance between the suspect and the officers, and the suspect's recent use of the weapon to threaten another person. *Id.* at 837.

When Defendants shot Romero the first time, he had not fully complied with multiple orders to "get on the ground" and to put his "face down," and he was not moving toward compliance.[6] Instead, he had lifted his shirt and put his hand on a gun that he had apparently used earlier in the evening during a dispute with his wife. He did not explain his intentions or make gestures clearly indicating that he intended to turn his weapon over to the officers. Nor did he reach for his weapon slowly and gradually, which might have given the officers an opportunity to specifically warn him not to touch his weapon. And by the time he put his hand on his gun, he could have quickly and easily turned it on his wife nearby or the officers in front of him. In fact, Plaintiff was only a few feet away to his left and would have been in a direct line of fire had he finished pulling the pistol out of his waistband with his right hand. Thus, not knowing Romero's intentions, but knowing the possibility that he might use his weapon again, Defendants had to

---

[6] Plaintiff contends that Romero did not immediately comply because Defendants' commands conflicted with one another, though there was nothing conflicting about directions to get on the ground and to put his head down.

make a split-second decision about how best to protect themselves and Plaintiff from the apparent threat he posed.

This case is somewhat similar to *Thornton*, where the Court of Appeals found no Fourth Amendment violation for the use of deadly force by officers on a man holding a shotgun.  There, the officers "reasonably believed that the man with the shotgun was the same man who had, only moments earlier, threatened another person with a gun" and where "[o]fficers repeatedly ordered [the suspect] to drop the shotgun but [he] failed to comply with the [o]fficers' orders."  *Thornton*, 727 F. App'x at 837.  "[B]ecause the deadly threat posed by [the suspect] could have easily and quickly transformed into deadly action in a split-second, any reasonable police officer in the [o]fficer's position would know that a decision to use deadly force would need to be rendered quickly."  *Id.*

As in *Thornton*, Romero had apparently used his gun minutes earlier during a heated dispute that was still in progress when officers arrived.  He did not fully comply with repeated orders to get on the ground and to put his face down; instead, he reached for his weapon.  At the time, his position and proximity to Defendants and Plaintiff gave him the means to quickly transform his conduct into deadly action, leaving Defendants few alternatives to stop the threat. Thus, this case falls close to, if not within, the zone of circumstances where any reasonable officer would conclude that deadly force was necessary to avert an immediate threat to their own safety or to the safety of Plaintiff.  At the very least, this is not a case where the officers using deadly force had no reason to believe the suspect was dangerous or presented an immediate threat of serious harm.

Plaintiff notes that "mere possession of a weapon is not sufficient to justify the use of deadly force"; rather, "there must be additional indicia that the safety of the officer or others is at

12

risk." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 480 (6th Cir. 2022). As indicated above, additional indicia of a safety risk were present here, including: Romero's recent use of a firearm during a dispute with his wife that was ongoing when officers arrived; his lack of full compliance with the officers' orders; and his unexpected attempt to remove a pistol from his waistband while in close proximity to the officers and his wife, who suddenly yelled after he revealed his pistol.  Thus, Defendants did not use deadly force on Romero merely because he possessed a weapon.

None of the cases cited by Plaintiff would have made clear to Defendants that their actions were unlawful.  In *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989), officers attempted to serve a peace warrant on a suspect at his home.  When the officers approached him, the suspect grabbed a rifle and then fired six shots into the air, telling the officers not to enter his property.  *Id.* at 213.  The officers then backed out of his property and he followed them to the gate.  As the officers were crouched behind their police vehicles, they saw the suspect place his rifle by the gate and then close the gate.  *Id.*  They warned him not to pick up his rifle.  When he did so, an officer fired his weapon and killed the suspect.  *Id.*  The court declined to grant qualified immunity because the reasonableness of a belief that there was a threat of serious physical harm depended on whether the suspect had pointed his weapon at the officers and whether he had his finger on the trigger, but there were genuine disputes of fact on those matters.  *Id.* at 216.

Unlike the officers in *Brandenburg*, Defendants were only a few feet away from Romero and were not protected by police vehicles.  Also, reaching for the handle of a pistol with his finger near the trigger, as Romero did, is not the same as picking up a rifle.  Given the smaller size and greater maneuverability of a pistol compared to a rifle, Romero's actions presented a more immediate risk of injury than those of the suspect in *Brandenburg*.  Also, unlike this case, there

were no facts in *Brandenburg* from which a reasonable officer could believe that the suspect had recently used his weapon to injure or threaten injury to a specific person.  Finally, the Court of Appeals has made clear that "an officer need not face the business end of a gun to use deadly force." *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019).  Thus, the fact that Romero did not actually point his pistol at Defendants or anyone else is not dispositive.

In *Lee v. Russ*, 33 F.4th 860 (6th Cir. 2022), the officer shot a knife-wielding suspect who was 30 feet away, had stood still for 20 seconds, had lowered his knife to his waist, and then made a step sideways. *Id.* at 863.  Given the weapon at issue and the distance between the suspect and the officer, the suspect did not pose an immediate threat.  *Id.* 865-66.  By contrast, Romero presented a much more serious threat because he was much closer to a potential victim and his weapon was more dangerous.

In *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011), the officer shot the suspect as the suspect was lowering his gun in response to the officer's command to do so.  *Id.* at 752.  By contrast, Romero was not moving toward compliance with Defendants' commands when they shot him. Instead, he was elevating the perceived threat by reaching for a weapon that he had used earlier in the evening.

In *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012), there was a dispute of fact about the circumstances in which the officers shot and killed the suspect.  Construing the evidence in the light most favorable to the plaintiff, they shot the suspect in the head "while he was lying on his couch and not pointing a gun at the officers" or "making any threatening gestures toward the officers." *Id.* at 663-64.  Some evidence indicated that he was not even looking at the officers, let alone threatening them.  *Id.* at 662-63.  Under such circumstances, a jury could conclude that he did not pose a serious threat of harm.  Those circumstances are different.  Romero was not lying

passively on a couch.  Moreover, *King* did not involve an officer responding to domestic violence involving the discharge of a firearm by the suspect.  Thus, that case is distinguishable.

Similarly, in *Jacobs*, there was a factual dispute about what occurred.  According to the plaintiff's version of the events, he entered his basement apartment not knowing that the police, who had already swept the whole house in order to arrest someone else, were on the main floor. *Jacobs*, 915 F.3d at 1033.  The police were aware of the plaintiff's presence.  When the plaintiff saw that his living area had been ransacked, he ran up the stairs, shouting "who the f— went into my house?"  *Id.*  When he saw an "unidentified black male" who he thought was "not supposed to be there," he spun around, reached for a pistol in its holster, and fell down the stairs.  *Id.*  As he did so, an officer shot him three times.

Critically, at no time did the police in *Jacobs* identify themselves or give the plaintiff a command and an opportunity to comply; rather, they shot him without warning almost immediately after seeing him.  Moreover, they did not possess any facts suggesting he had recently used his firearm on, or in an argument with, another person.  Thus, unlike Defendants here, they had no reason to believe the plaintiff might resort to violence instead of following their orders. Accordingly, *Jacobs* is distinguishable and would not have made it clear to Defendants that their conduct was unconstitutional.  The same reasoning applies to *Craighead* and to *Floyd v. City of Detroit*, 518 F.3d 398 (6th Cir. 2008), where officers shot suspects without warning almost immediately after seeing them.  *Craighead*, 399 F.3d at 962; *Floyd*, 518 F.3d at 408.  Defendants did not do that to Romero.  They gave him ample opportunity to comply with their commands to get on the ground and put his head down before he reached for his weapon, and he was aware of their commands.

In *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996), an officer shot the suspect as he was walking with his hands at his side to answer his front door.  *Id.* at 1163.  At the time, the door was closed and the suspect was still inside the home.  *Id.*  In other words, unlike Romero, the suspect posed no threat to the officers.

Plaintiff argues that her case should go forward because a jury could reasonably conclude that Romero was attempting to turn his weapon over to Defendants rather than use it on them.  For instance, Plaintiff insists that Defendants should have known through their experience that Romero was attempting to turn over his pistol because he put his index finger along the barrel of the weapon instead of on the trigger.   "Yet, qualified immunity protects officers from liability for mistakes of law and fact."  *Chappell v. City of Cleveland*, 585 F.3d 901, 916 (6th Cir. 2009).  Here, there are no facts alleged in the complaint or apparent in the video indicating that Defendants, "in potentially misinterpreting [Romero's] actions, where plainly incompetent or deliberately violated his rights[.]"  *See id.*  Even if a jury could conclude that Romero was attempting to turn over his weapon, Defendants were not plainly incompetent in perceiving his actions as threatening.  After all, a finger on the barrel of a pistol is only inches from the trigger.  And given the speed of Romero's movements, the lack of forewarning about his intentions, and his failure to fully comply with orders, it would have been difficult for any reasonable officer in Defendants' position to discern the difference between grabbing the gun to use it versus grabbing the gun to hand it over.  Qualified immunity protects them for making a split-second decision to use force in these uncertain circumstances.

In short, considering the facts alleged and those clearly depicted in the videos, Plaintiff has failed to satisfy her burden of showing that the law was clearly established such that Defendants would have known that their use of deadly force was unconstitutional.  Accordingly, Moore and

Kurtz are entitled to qualified immunity for shooting Romero after he reached for and put his hand on his pistol.

### 3. Shooting Romero Again

Moore and Kurtz are also entitled to qualified immunity for shooting Romero again after he fell to the ground. The resolution of this issue generally follows from the reasoning in the previous section. The surrounding circumstances were mostly the same. And as before, Romero made no clear indication that he was attempting to comply with Defendants' orders or that he wanted to turn over his weapon. He did say "I got you" two times but those statements could reasonably be interpreted as a threat rather than an acknowledgement that he understood what Defendants were asking. As discussed above, qualified immunity protects Defendants from a reasonable misunderstanding of Romero's intentions. *See Chappell*, 585 F.3d at 916. Indeed, the fact that Romero grabbed his pistol again after being shot for doing that the first time suggests he did *not* intend to comply with their commands.

True, "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). But while Romero had fallen forward and was not as much of an immediate threat *to Plaintiff*, he was not incapacitated. The video confirms that he was still very much capable of shooting Moore or Kurtz. After Moore shot him the first time, Romero grabbed his gun with his body turned toward Moore and Kurtz and, while being shot, tossed the weapon in their direction. Finally, he acted within seconds after falling on the ground, forcing Defendants to make a quick decision as to their response. Plaintiff has not met her burden of overcoming qualified immunity for their actions.

In summary, Defendants Moore and Kurtz are entitled to qualified immunity for Count I. Because Plaintiff appears to sue them in their individual capacities only, the Court will dismiss this claim.

### C. Count II:  Failure to Intervene

Plaintiff claims that Defendants Moore and Kurtz are each liable for the other's use of excessive force because they failed to intervene to stop the other's actions.  Based on the reasoning above regarding Count I, Defendants are entitled to qualified immunity for this claim.  If Defendants are entitled to qualified immunity for their own actions, it follows that they are entitled to qualified immunity for failing to prevent the actions of the other.  If it was not clearly established that their own conduct violated Romero's constitutional rights, then it was not clearly established that they had to prevent the other's conduct.  Therefore, the Court will dismiss Count II.

### D. Count III: Municipal Liability

Plaintiff claims that the City is liable for the alleged violations of Romero's constitutional rights.  A municipality like the City "may not be held liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2013) (quoting *Monell*, 436 U.S. at 691).  "Instead, a plaintiff must show that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'"  *Wright*, 962 F.3d at 879-80 (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).  "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of his rights."  *Id.* at 880 (quoting *Monell*, 436 U.S. at 694).

Plaintiff claims that the City had a custom or policy of failing to adequately train and supervise officers with respect to the use of deadly force.

> To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.

*Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286-87 (6th Cir. 2020) (quoting *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).  In other words, "the inadequacy of police

training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." *Id.* at 287 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"There are 'at least two situations in which inadequate training [or supervision] could be found to be the result of deliberate indifference.'" *Id.* (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). First, Plaintiff can show deliberate indifference by showing a failure to act "in response to repeated complaints of constitutional violations by its officers." *Id.* (quoting *Cherrington*, 344 F.3d at 646). Under this approach, Plaintiff must allege facts from which to infer that the City's awareness of "*prior* instances of unconstitutional conduct" put it on notice that its training or supervision was "deficient and likely to cause injury." *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005) (emphasis added)).

Second, Plaintiff can show that the City was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)). In other words, the "need for more or different training" may be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the City's failure amounts to deliberate indifference. *Id.* (quoting *Harris*, 489 U.S. at 390). Under this approach, notice of a pattern of unconstitutional conduct is not necessary; deliberate indifference may be present because the "risk of the constitutional violation is so obvious or foreseeable" that the City should have prepared its officers for it. *Id.*

Even when drawing all reasonable inferences in her favor, Plaintiff's allegations do not satisfy either approach. Plaintiff alleges no specific facts about the City's training program. Instead, she contends that Moore and Kurtz would have taken different actions had they been properly trained. For instance, they would have taken a position of cover, used de-escalation

techniques, or "refrained from initiating a rapid intervention with weapons drawn and aimed at [Romero]."  (Am. Compl. ¶ 119.)  These assertions are speculative and conclusory and do not plausibly show deliberate indifference by the City in its training program.

Moreover, there is no plausible connection between those alleged inadequacies in training and the harm suffered by Plaintiff.  Officers Moore and Kurtz had to confront a potentially volatile and dangerous domestic dispute where one spouse possessed a gun, had used it, and had possibly injured the other.  A strong show of force was reasonable to prevent further injury to Plaintiff and to check on her well-being.  It is not clear how "de-escalation techniques" and taking a position of cover would have helped the situation or prevented the outcome.  Put another way, it is not so obvious that the lack of such training would likely result in a violation of constitutional rights.

Plaintiff argues that the Court should give her an opportunity for discovery in order to prove her claim.  However, there is no relaxed pleading standard for claims based on facts or suspicions that a plaintiff cannot learn or confirm until after conducting discovery.  In all cases, a plaintiff must present a complaint that pleads sufficient factual matter to state a "plausible" claim, rather than a merely "possible" one.  *See Iqbal*, 556 U.S. at 679.  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss" and "unlock[s] the doors of discovery."  *Id.* at 678-79; *see Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 498 (6th Cir. 2023) ("[F]ederal courts will not 'unlock the doors of discovery' for a fishing expedition based on a plaintiff's speculative assertions." (quoting *Iqbal*, 556 U.S. at 678-79)).  Consequently, the Court will dismiss the City for failure to state a claim.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to dismiss. Defendants Moore and Kurtz are entitled to qualified immunity for Counts I and II. Plaintiff fails to state a claim against the City in Count III.

The Court will enter an order consistent with this Opinion.


Dated: September 18, 2024                      /s/ Hala Y. Jarbou
                                               HALA Y. JARBOU
                                               CHIEF UNITED STATES DISTRICT JUDGE